UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHYIRONDA RICHARDSON,
Individually and as Legal Guardian of
JOE RICHARDSON, III,
a Legally Incapacitated Individual, and
PEGGY JEFFERSON, as Next Friend of
Janee M. Lee, Joseph A. Richardson,
Tykeyah J. Walker, and Tacarhi J. Richardson,          Case No. 5:04-cv-27
minors,
                                                       Hon. Wendell A. Miles
          Plaintiffs,

and

CINCINNATI INSURANCE COMPANY,

          Plaintiff - Intervenor,

v

TIME MANUFACTURING COMPANY,
a foreign corporation,

          Defendant.
_____/


**<u>OPINION AND ORDER ON PENDING MOTIONS</u>**


        This diversity removal action is currently before the court on the following motions: (1) a

motion by plaintiffs to approve settlement and distribution of settlement proceeds (docket no.

152); (2) a counter-motion by intervenor Cincinnati Insurance Company ("Cincinnati")

apportionment of settlement funds (docket no. 189); and (3) Cincinnati's motion to strike the

first amended complaint (docket no. 179).

        For the reasons to follow, the court DENIES the motion to strike and approves

distribution of the net settlement funds as follows: 89 percent to Cincinnati, and 11 percent

collectively to Chyironda Richardson and minors Janee M. Lee, Joseph A. Richardson, Tykeyah

J. Walker, and Tacarhi J. Richardson.

**I**

On February 9, 2001, Joseph Richardson suffered a catastrophic brain injury when he

became pinned under a rafter while using an aerial bucket lift to perform work on a garage door

at a Muskegon auto dealership.  Defendant Time Manufacturing Company ("Time") designed

and manufactured the lift, known as the Versalift model B-24G.  At the time of his injury,

Richardson was employed by Reliable Overhead Door and Gate Systems ("Reliable"), which

owned the Versalift.  In this action, plaintiff Chyironda Richardson, the wife of Joseph

Richardson (to whom the amended complaint refers as Joe Richardson, III), sued Time both on

behalf of herself and as legal guardian of her husband, alleging that Time was liable for problems

in the design and/or manufacture of the Versalift which caused her husband's injuries.

Cincinnati was the workers' compensation carrier for Reliable.  Since Joseph's injury,

Cincinnati has paid for healthcare services rendered to Joseph, in addition to other workers'

compensation benefits, including but not limited to wage loss and medical expenses.  The

amounts Cincinnati has paid to date exceed $1,100,000.00.

A jury trial in the case began on May 22, 2006.  On May 25, 2006, the fourth morning of

the trial, after the conclusion of plaintiffs' proofs, the parties – who at that time consisted of only

Chyironda Richardson, both on behalf of herself and her husband, and Time –  reached a

confidential settlement.  In short, the settlement was precipitated by plaintiffs' assessment that

the case had not gone well for them.  Although the amount of the settlement will not be listed in

this decision, it suffices to say that the amount was substantially less than the workers'

compensation lien held by Cincinnati pursuant to Michigan law.  Cincinnati, which had not at

that point yet moved to intervene in the proceedings, did not participate in the settlement

negotiations which took place on the morning of May 25, 2006.  Notwithstanding the knowledge

of Cincinnati's outstanding lien, plaintiffs' counsel did not obtain the approval of the

compensation carrier before agreeing on the settlement with Time.  Although plaintiff's counsel

attempted to contact Cincinnati's representative before accepting Time's settlement offer, he was

unsuccessful in his attempt.  Plaintiffs' Brief in Support of Its Petition to Approve Settlement

and Distribution of Settlement Proceeds, Exhibit 4 (Affidavit of J. Paul Janes) at 4, ¶ 29.  Based

on the parties' representation that the case was settled, the jury was excused before reaching a

verdict.

Ultimately, plaintiffs' counsel did communicate with Cincinnati's representative

regarding the settlement, requesting that Cincinnati agree to accept, in satisfaction of its lien, a

sum which amounted to approximately 20 percent of the net proceeds of the settlement, after

payment of attorneys' fees and expenses of recovery, with the bulk of the remainder going to

Chyironda and to Joseph Richardson's four minor children by two other women:  Janee M. Lee,

Joseph A. Richardson, Tykeyah J. Walker, and Tacarhi J. Richardson.  Plaintiff's Motion (docket

no. 152), Exhibit 1.  Cincinnati did not agree to this request. On June 20, 2006, plaintiffs filed

their motion (styled as a "petition") to approve the settlement and distribution, in which they

proposed that 20 percent of the net proceeds be distributed to Cincinnati.

Cincinnati moved for leave to intervene.  Cincinnati also opposed plaintiffs' proposed

distribution and proposed its own, under which approximately 20 percent of the net proceeds

would be distributed to Chyironda Richardson and the remaining approximately 80 percent to Cincinnati.  Subsequently, on July 18, 2006, plaintiffs filed a brief in support of their own proposed distribution.  In their brief, plaintiff proposed that approximately 25 percent of the net proceeds be distributed to Cincinnati, or approximately five percent more than plaintiffs had previously proposed in their motion.  Plaintiffs' Brief (docket no. 165), at 14.

At a hearing held on plaintiffs' motion, the court granted Cincinnati leave to intervene to protect its lien.  The court also granted an oral motion by plaintiff for leave to amend the complaint to add Joe Richardson's four minor children as plaintiffs.  Finally, the court approved the distribution of plaintiffs' counsel's attorney fees and costs from the settlement, in addition to a partial distribution of $15,000 of the net remaining proceeds to Chyironda Richardson.  The hearing was adjourned so that guardians ad litem could be appointed for both Joe Richardson and the minor children.

## II

After plaintiffs filed their amended complaint adding the minor children as parties, Cincinnati filed its motion to strike the amended pleading.  In its motion, Cincinnati argues that the court should strike the pleading because (1) plaintiffs' motivation for adding the children to the lawsuit was to avoid Cincinnati's workers' compensation lien; (2) any potential claims by the children were not presented to the jury in the aborted trial; and (3) the addition of the children as parties is untimely and unduly prejudicial to Cincinnati.

Fed.R.Civ.P. 15(a) provides that leave to amend the pleadings "shall be freely given when justice so requires."  Subsection (b) of Fed.R.Civ.P. 15 further provides as follows:

4

**(b) Amendments to Conform to the Evidence.**  When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Cincinnati argues that Rule 15(b) does not authorize the amendment which the court permitted adding the children, because the claims of the children were not "tried" within the meaning of the rule, insofar as the children did not testify at the trial and would not have been listed on the jury verdict form had the case been submitted to the jury.  In response, plaintiffs concede that any potential claims of the minor children were initially omitted from the case for strategic reasons because Joe Richardson was never married to the children's mothers and it was believed that it would be prejudicial to him if the jurors evaluating his claim knew that he had fathered four children out-of-wedlock.[1]  However, plaintiffs further argue, notwithstanding the children's exclusion from consideration at the trial, that the settlement negotiated with Time was intended to be a global settlement of all potential claims against Time, including those of Joe Richardson's minor children.  Time has concurred in this position.

_____

[1]In proposed jury instructions submitted before trial (docket no. 136), the parties did not request the giving of M Civ JI 52.02, the Michigan standard jury instruction on damages for a child of an injured parent.  Plaintiffs' current concessions regarding the trial strategy confirm that the failure to request an instruction on this element of damage was no oversight.

5

The court finds that the settlement negotiated between plaintiffs and Time was indeed intended to be a global settlement of all potential claims arising from Joe Richardson's injury, including those of Joe's minor children.  If not for the addition of the children as parties, there would be no settlement at all.  Therefore, the court concludes that the merits of the action and the interests of justice were and are served by permitting the amendment pursuant to the broad language of Rule 15(a), even if the amendment does not technically fall within the terms of Rule 15(b).

Although Cincinnati argues that the addition of the children as parties is prejudicial to its interests, this argument is based on Cincinnati's assessment that the children were added as parties solely to defeat Cincinnati's workers' compensation lien.  However, given the state of Michigan law, as discussed in Section III of this Opinion and Order below, Cincinnati is not prejudiced by the addition of the children, whose claims do not have priority over Cincinnati's lien.  Moreover, it is clear that there would be no settlement at all – and Cincinnati would therefore obtain no satisfaction of its lien – but for the addition of the children as participants in a global resolution of all potential claims against Time.  Under the circumstances, the court rejects Cincinnati's claims of prejudice and denies the motion to strike plaintiffs' amended pleading.

**III**

The question presented by the two other pending motions is how the remaining settlement funds should be distributed.  After the distribution of the attorney fees and costs, just over 50 percent of the total remains to be distributed.  After the partial distribution of $15,000 to

6

Chyironda Richardson, less than 50 percent of the total remains to be distributed.

As noted above, plaintiffs' original motion to approve the distribution of the net settlement proceeds proposed distribution of the bulk of the net settlement proceeds, after attorneys' fees and costs of recovery, to Chyironda, with a large portion also to be divided equally among the four children but with only 20 percent of the net proceeds going to Cincinnati toward satisfaction of its lien. Only after Cincinnati had opposed this proposed distribution did plaintiffs file a supporting brief, in which they proposed a larger payment – 25 percent of the net proceeds – to Cincinnati. According to plaintiffs, at the time they agreed to the settlement with Time, Cincinnati had made a "commitment . . . that it would accept 25 percent of the net settlement, after legal fees and costs were deducted, to satisfy its [lien]." Plaintiffs' Brief in Support (docket no. 165), at 2. Plaintiffs now take the position that they acted in reliance on this alleged "commitment" in agreeing to settle with Time, and they argue that Cincinnati should not now be heard to oppose plaintiffs' proposal to distribute 25 percent of the net proceeds to Cincinnati, consistent with the workers' compensation carrier's alleged "commitment."

Plaintiffs' argument that they relied this purported "commitment" by Cincinnati to accept 25 percent of the net settlement proceeds in satisfaction of its lien is not credible, for a number of reasons. First, plaintiffs have readily admitted that after the third day of trial, they knew that the prospects of a favorable jury verdict were unlikely. See Plaintiffs' Brief in Support (docket no. 165) at 9 (stating that  "Plaintiffs' chances of a successful recovery were significantly impaired" and referring to "the limited prospects of a successful jury verdict").  Plaintiffs also concede that they were told by defense counsel before commencement of the fourth day of trial that Time's offer to settle the case would be withdrawn "immediately" if the case was not resolved. Id.

Plaintiffs were therefore aware that they had to settle, or risk the prospects of no recovery whatsoever.

Plaintiffs' allegation that Cincinnati made a firm "commitment" to accept 25 percent of the net proceeds in satisfaction of its lien is also not credible because plaintiffs themselves concede that their counsel attempted to contact Cincinnati's representatives on the morning of May 25, 2006, before accepting Time's offer.  Id. at 10; see also Plaintiffs' Exhibit 4 (docket no. 165-5), Affidavit of J. Paul Janes at 4, ¶ 29.  This attempt indicates an awareness that the carrier's agreement was necessary.  However, rather than seeking a brief adjournment in order to make additional attempts to contact Cincinnati's representatives before the jurors were excused, plaintiffs instead gambled that the carrier would agree to take whatever percentage on its lien that plaintiffs decided to offer.[2]  Plaintiffs' current allegation of a firm "commitment" by the carrier to accept 25 percent of the net proceeds has the appearance of an after-the-fact attempt to justify their gamble rather than a reasonable reliance on any previous position taken by Cincinnati.

Moreover, even if plaintiffs believed that Cincinnati had at one point earlier in the litigation agreed to compromise its lien in order to achieve a settlement, it is simply not reasonable for plaintiffs to believe that they had continuing authority to act on Cincinnati's behalf to achieve a compromise.  Any evidence which plaintiffs have submitted in support of their contention that Cincinnati had made a firm "commitment" to compromise its lien is limited

---

[2]On the morning of May 25, 2006, plaintiffs did not inform the court that they had tried, without success, to contact Cincinnati's representatives.  Instead, plaintiffs represented to the court that Cincinnati had agreed "to take a small percentage and keep taking care of Joe for the rest of his life and keep paying the income, and then Chyironda and Joe's four children will receive something . . . ."  Transcript, Day Four of Jury Trial (docket no. 163) at 2.

to specific points in the case, including a facilitative mediation which occurred in April, 2006

and a final pretrial conference held in August, 2005. Nothing submitted by plaintiffs indicates

that Cincinnati bestowed upon plaintiffs continuing authority to negotiate in the carrier's behalf

beyond those limited time periods, and in the absence of such express authority, it is simply not

reasonable for plaintiffs – who are represented by counsel – to believe they were authorized to

accept a compromise on the carrier's behalf.

Finally, even if plaintiffs had submitted credible evidence of a continuing agreement by

Cincinnati to compromise its lien at 25 percent of the net proceeds (and there is no such

evidence), plaintiffs had clearly abandoned that arrangement by the time they filed their motion,

in which they proposed to distribute only approximately 20 percent – not the supposedly agreed-

to 25 percent – of the net proceeds to Cincinnati. The amount which plaintiffs have proposed be

distributed to Cincinnati has therefore been a moving figure, beginning at 20 percent of the net

proceeds (in plaintiffs' original motion), and only later moving up to 25 percent (in plaintiffs'

brief in support).[3] Plaintiffs, who abandoned the purported 25 percent compromise agreement in

filing their original motion for approval of a distribution which would give only 20 percent of the

net to Cincinnati, cannot now try to enforce it. The issue of an alleged agreement is, in the

court's view, a dead one.

Because there is no credible evidence of an enforceable agreement by Cincinnati to

_____

[3]Interestingly, plaintiffs's most recently filed brief, opposing Cincinnati's cross-motion for distribution of the settlement proceeds, is accompanied by an attachment which indicates that in August, 2005 Cincinnati was proposing a tiered approach to settlement, in which it would accept 50 percent of net proceeds of any settlement up to $840,000. Plaintiffs' Response (docket no. 192), Exhibit 1. However, plaintiffs have not argued that they relied on this 50 percent figure.

compromise its lien, any evidence of settlement negotiations with Cincinnati becomes inadmissible for purposes of determining how the court should order the distribution of the remaining settlement proceeds or for the purpose of proving the validity of any loss of consortium claims by Chyironda Richardson or Joe's four children.  See Fed.R.Evid. 408 ("Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.  Evidence of conduct or statements made in compromise negotiations is likewise not admissible").  The question therefore becomes one of the amount or amounts to which the plaintiffs are entitled under the applicable Michigan law.

Under Michigan law, the spouse and children of an injured plaintiff are entitled to only loss of consortium damages, not economic damages.   See Rusinek v. Schultz, Snyder & Steele Lumber Co., 411 Mich. 502, 309 N.W.2d 163,164 (1981) ("The right of a spouse to recover from a tortfeasor for loss of consortium occasioned by injuries inflicted on the other spouse is well established in Michigan's common law"); Berger v. Weber, 411 Mich. 1, 303 N.W.2d 424, 425 (1981) (child has a cause of action for loss of society and companionship of a negligently injured parent).  "A claim for loss of consortium is simply one for loss of society and companionship." Eide v. Kelsey-Hayes Co., 431 Mich. 26, 427 N.W.2d 488, 489 (1988).  These are intangible losses.  Id.

The law on its face indicates that in this instance, because the amount of Cincinnati's lien exceeds the amount of the settlement, Cincinnati is entitled to all of the net proceeds after payment of the costs of recovery.  The applicable workers' compensation statute is M.C.L. §

418.827(5).  This provision provides in pertinent part as follows:

> In an action to enforce the liability of a third party, the plaintiff may recover any amount which the employee *or his or her dependents or personal representative* would be entitled to recover in an action in tort.  *Any recovery* against the third party for damages resulting from personal injuries . . ., after deducting expenses of recovery, *shall first reimburse the employer or carrier* for any amounts paid . . .

M.C.L. § 418.827(5) (emphasis supplied).  The Michigan Supreme Court has decided, in the context of a wrongful death action, that a worker's compensation carrier is entitled to seek reimbursement from the entire amount of a third-party tort recovery, regardless of the classification of damages.  Estate of Eddington v. Eppert Oil Co., 441 Mich. 200, 490 N.W.2d 872, 875 (1992).  In Eddington, the court was adamant that the language of § 418.827(5) is "clear and unambiguous."

Although Eddington was a wrongful death action, nothing in § 418.827(5) indicates that the statute applies any differently when the worker is injured but survives his injury.  The statute expressly refers to the employee's "dependents *or* personal representative" and to "*[a]ny* recovery" against a third party for damages.  M.C.L. § 418.827(5) (emphasis supplied).  Moreover, Michigan's supreme court later reaffirmed its holding in Eddington in a non-death case, Piper v. Pettibone Corp. 450 Mich. 565, 542 N.W.2d 269 (1995).  In Piper, the court once again held that the language of § 418.827(5) was "clear" that all of the monies recovered for the injured worker's personal injuries – on behalf of both the surviving injured worker and his spouse – must first be used to reimburse the employer for the worker's compensation amounts it had paid.  542 N.W.2d at 272.  Given these rather clear holdings, and in the absence of an agreement otherwise by Cincinnati, the court has no other choice but to conclude that Michigan

11

law requires that all of the net proceeds must be distributed to Cincinnati, insofar as those proceeds are insufficient to satisfy its workers' compensation lien.

Certain cases decided by the Michigan Court of Appeals have, in disregard of the "clear" language of § 418.827(5), held that the workers' compensation lien does not attach to any portion of a recovery for loss of consortium.  E.g., Jones v. McCullough, 227 Mich. App. 543, 576 N.W.2d 698, 699 (1998); Tucker v. Clare Bros., Ltd., 196 Mich. App. 513, 493 N.W.2d 918, 921-922 (1992); Treadeau v. Wausau Area Contractors, Inc., 112 Mich. App. 130, 316 N.W.2d 231, 234 (1982);  Lone v. Esco Elevators, Inc., 78 Mich. App. 97, 259 N.W.2d 869, 874(1977). However, these cases decided by Michigan's intermediate level appellate court contravene not only the clear language of the applicable statute but also the law as decided by Michigan's highest court – law that this federal court sitting in diversity is bound to follow.[4]

Through testimony of the guardian ad litem appointed on behalf of Joe Richardson, plaintiffs have urged the court to adopt principles of equity which displace the applicable law.

---

[4]In diversity actions, the highest state court is the final authority on state law.  Fidelity Union Trust Co. v. Field, 311 U.S. 169, 61 S.Ct. 176, 178 (1941); West v. American Telephone & Telegraph Co., 311 U.S. 223, 61 S.Ct. 179, 183 (1940).  Although a federal court may consider decisions from the state's intermediate appellate courts, it may do so only in the absence of more convincing evidence of what the state law is, and to the extent that those decisions reflect the likely outcome were the state's highest court to decide the issue. See Field, 61 S.Ct. at 178 ("An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question"); see also Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc., 249 F.3d 450, 454 (6th Cir. 2001) ("In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court. . . .  If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. . . .  'Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the Michigan Supreme Court would decide otherwise'") (footnote and citations omitted).

This the court cannot and will not do.  Here, both the controlling statute and controlling case law

decided by Michigan's highest court are unmistakably clear: after deducting the expenses of

recovery, any recovery for damages resulting from the employee's personal injuries or death

must first be used to reimburse the employer or workers' compensation insurance carrier for

amounts paid under the workers' compensation statute.  Piper, 542 N.W.2d at 272.  Indeed, the

same invocation of equity made here was rejected by the court in Piper:

> The difficulty with these appeals to equity is that they are being presented
> in the wrong forum.  It is for the Legislature to weigh the equities in this complex
> area.  Balancing the many competing considerations, the Legislature has produced
> a statutory enactment of singular clarity[.] . . .
>     We recognize that the outcome in this case deprives the plaintiffs [the
> employee and his spouse] of the proceeds of their recovery . . .
>     While there could be other reasonable formulae for the allocation of a
> third-party recovery in the circumstances of this case, imposition of an alternative
> method is not within the province of this Court.  In the face of clear statutory
> language, we are not free to select another approach on the ground that we deem
> it more equitable.  We must enforce the clear statutory language, as written.

Piper, 542 N.W.2d at 272.

Notwithstanding the clear mandate of Michigan law, Cincinnati urges the court to

"allocate" the remaining net proceeds of the settlement, attributing 89 percent of that amount to

Joe Richardson – and thereby to Cincinnati – and 11 percent to both his wife Chyironda and his

four minor children.  Although no legal basis for such an "allocation" currently exists under the

applicable Michigan law, the court considers Cincinnati's current position to be an effective

waiver of its rights, to the extent that it does not oppose distribution of 11 percent of the net

proceeds to its insured's wife and children.  Therefore, the court will, in a separate order,

approve distribution of an amount representing 11 percent of the net settlement funds to

Chyironda Richardson,  Janee M. Lee, Joseph A. Richardson, Tykeyah J. Walker, and Tacarhi J. Richardson.[5]


## **Conclusion**

For the foregoing reasons, intervenor Cincinnati's motion to strike the amended complaint is denied.  A separate order, consistent with the decision above, will be issued outlining the distribution of the settlement proceeds.

So ordered this 29th day of September, 2006.


 /s/ Wendell A. Miles
Wendell A. Miles
Senior U.S. District Judge

---

[5]Because the court previously approved a partial distribution of $15,000 to Chyironda Richardson, this amount will be deducted from the net proceeds payable to her.

Plaintiffs have requested that $5,999.37 be distributed to the Rivertown Community Federal Credit Union.  However, because plaintiffs have not documented the origins of this alleged debt, the court's distribution order will make no provision for its payment.